UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ROBERT MACAMAUX, | : | CIVIL CASE NO. |
|     Plaintiff, | : | 3:09-cv-164 (JCH) |
| | : | |
| v. | : | |
| | : | |
| DAY KIMBALL HOSPITAL, | : | SEPTEMBER 16, 2011 |
|     Defendant. | : | |

**RULING RE:  MOTION FOR SUMMARY JUDGMENT (DOC. NO. 117)**

**I.    INTRODUCTION**

The claims in this action arise from the medical evaluation and treatment provided by defendant, Day Kimball Hospital, to plaintiff, Robert Macamaux, following an automobile accident.  In an Amended Complaint, Macamaux asserts six causes of action under federal and state law.  Day Kimball has moved for summary judgment regarding three of these claims:  Count I, a claim for failure to provide an appropriate medical screening examination as required by the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd(a); Count II, a claim for failure to stabilize an emergency medical condition as required by EMTALA, 42 U.S.C. § 1395dd(b); and Count IV, a state law claim for failure to obtain Macamaux's informed consent.  Counts III, V, and VI of the Amended Complaint are not at issue here.  For the reasons that follow, Day Kimball's Motion is granted in part and denied in part.

**II.   FACTS**[1]

At approximately 4:00 pm on January 16, 2006, Macamaux was in a traffic accident while traveling on Interstate 395 in Plainfield, Connecticut.  Based on

---

[1] Unless otherwise cited, the following facts are based upon the uncontested portions of the parties' Local Rule 56(a) Statements.

Macamaux's complaint of neck pain, the first responders on the scene placed Macamaux on a backboard and fitted him with a cervical collar. Macamaux was then transported by ambulance to Day Kimball Hospital in Connecticut, arriving at 4:54 p.m.

At Day Kimball's emergency department, the triage nurse assessed Macamaux and noted that he complained of neck and back pain and pain between the shoulders. Subsequently, Macamaux was examined by Dr. Nelson, a board certified emergency physician on duty, and  Macamaux was registered in Day Kimball's computer system as complaining of "upper back pain." Dr. Nelson ordered x-rays for cervical spine trauma and x-rays of the chest. At the time the x-rays were ordered, no radiologists were scheduled to be on duty. In such circumstances, Day Kimball policy calls for the x-rays to be read in the first instance by the emergency department, i.e., by Dr. Nelson, and reviewed later by a radiologist during a subsequent shift. In his deposition, Dr. Nelson testified that he interpreted these x-ray images and then reassessed Macamaux and found that Macamaux had scapula pain, but no neck pain or tenderness. Nelson Dep. (Pl. Ex. 3) at 52-53, 58. These findings are not recorded in the medical record. See Pl. Ex. 11.

By 6:30 p.m., Dr. Nelson ordered a CT scan of Macamaux's chest and a blood alcohol test. However, Dr. Nelson canceled these tests at 6:35 p.m. Dr. Nelson testified that he had spoken to Macamaux about "getting a CT scan of his chest and he wanted to leave. That's why these orders were canceled." Nelson Dep. at 58; see id. at 91. However, Macamaux was not then discharged. At approximately 6:40 p.m., Dr. Nelson ordered additional x-rays, including chest x-rays, an x-ray of the left scapula, and a lateral x-ray of the cervical spine. Dr. Nelson testified that he ordered these

additional x-rays "because this first group was not adequate in my opinion." Id. at 58.

At 7:25 p.m., after interpreting the second set of x-rays, Dr. Nelson evaluated Macamaux again and determined to discharge him. At that time, Dr. Nelson noted, "Home with son. Stable." At 7:45 p.m., Macamaux was discharged with a diagnosis of "MVA, Back strain." In a typewritten report prepared eleven days later, Dr. Nelson states that, while at Day Kimball, Macamaux had denied having neck pain, that Dr. Nelson had ordered a "minimum of 4 views" with "no fractures seen." Macamaux claims that he did not deny having neck pain.

Day Kimball's Diagnostic Services Manual contains a policy regarding the images that must be taken when cervical spine trauma x-rays are ordered. That policy lists a number of steps that "must be performed," including taking the following cervical images: a "Shoot-thru Lateral," a "Swimmer's," and "AP and Odontoid films." Day Kimball Policy DI: Trauma Procedure (Pl. Ex. 10 at 13-15). Regarding the "Swimmer's" image, the policy states, "C7-T1 junction MUST be clearly visualized." Id. The policy further indicates that the reviewing "physician will notify the technologist whether or not the patient needs any additional films." Id. (Pl. Ex. 10 at 14). That was apparently not done here.

On January 17, 2006, the day after Macamaux was discharged, his x-rays were reviewed by Dr. Millard, a board certified radiologist at Day Kimball. Dr. Millard's report noted that, in the first set of x-rays taken, "[t]he C7 vertebral body is not well seen," and that, in the second set taken, the "C7 vertebral body is not included on examination." Dr. Millard's report indicates that the inability to see the C7 vertebra is due to the "difficulty in penetrating the patient's shoulders." A subsequent review by plaintiff's

3

medical expert confirmed that the images did not permit visualization of the C7 vertebra due to difficulty penetrating the patient's shoulders. Based on Dr. Millard's finding, a physician's assistant at Day Kimball ordered that there be a follow up communication with Macamaux with a recommendation that Macamaux see a physician for follow up. A letter was sent to Macamaux four days later, on January 21, 2006.

On January 19, 2006, two days before the letter was sent, Macamaux began to experience neck pain, arm pain, swelling of his throat, and difficulty breathing, and he checked himself into the emergency department at Landmark Medical Center in Rhode Island. A CT scan of the cervical spine was performed, revealing multiple fractures and significant dislocation at the C7-T1 junction. Macamaux was immobilized and transferred to Rhode Island Hospital, where he underwent surgery to stabilize his spine. After ten days, on January 30, 2006, Macamaux was discharged to Rehabilitation Hospital for physical and occupational therapy, and on February 3, 2006, he was discharged from Rehabilitation Hospital.

Macamaux admits that he would have required spinal surgery regardless of when the fracture was diagnosed, but contends that, due to the delay in diagnosis, he suffered permanent spinal cord injury and neurological deficits, including pain, weakness and limited ability to use his shoulders, neck, and upper extremities. Macamaux claims that he has been unable to return to work as a result.

### III.     SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000).  Once the moving party has met its burden, in order to defeat the motion, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor. Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record to address questions of fact, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38.  Summary judgment "is properly granted only when no rational finder of fact could find in favor of the non-moving party."  Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000).  "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the finder of fact.  Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

**IV.    DISCUSSION**

    **A.    Failure to Provide Appropriate Screening Pursuant to EMTALA (Count I)**

EMTALA requires that, when a person is presented to a hospital emergency department for examination or treatment,

> the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition . . . exists.

42 U.S.C. § 1395dd(a).  The term, "appropriate medical screening examination," is not

defined in the statute.

Courts have consistently held that this screening requirement does not impose a general federal law against malpractice or negligent diagnosis. See, e.g., Hardy v. New York City Health & Hosp. Corp., 164 F.3d 789, 792 (2d Cir. 1999) ("EMTALA is not a substitute for state law on medical malpractice. It was 'not intended to guarantee proper diagnosis or to provide a federal remedy for misdiagnosis or medical negligence.'" (quoting Power v. Arlington Hosp. Ass'n, 42 F.3d 851, 856 (4th Cir. 1994)); Gatewood v. Washington Healthcare Corp., 933 F.2d 1037, 1041 (D.C. Cir. 1991) ("[W]e cannot agree that [EMTALA] creates a sweeping federal cause of action with respect to what are traditional state-based claims of negligence or malpractice.").

Instead, EMTALA requires hospitals to provide uniform or even-handed screening examinations for emergency conditions, consistent with their own policies and based on the hospital's capabilities and the medical circumstances and symptoms presented. See, e.g., Marshall v. East Carroll Parish Hosp., 134 F.3d 319, 323 (5th Cir. 1998) ("Most of the courts that have interpreted ['appropriate medical screening examination'] have defined it as a screening examination that the hospital would have offered to any other patient in a similar condition with similar symptoms." (citing numerous cases)); Brooks v. Maryland Gen. Hosp. Inc., 966 F.2d 708, 710-11 (4th Cir. 1993) (Under EMTALA, "the hospital must apply its standard of screening uniformly to all emergency room patients, regardless of whether they are insured or can pay." (emphasis in original)); Gatewood, 933 F.2d at 1041 ("[T]he Act is intended . . . to ensure that each is accorded the same level of treatment regularly provided to patients in similar medical circumstances."). A hospital violates this requirement if it fails to

6

provide a screening consistent with its own standard screening procedures for the issue presented.  See Correa v. Hospital San Francisco, 69 F.3d 1184, 1192 (1st Cir. 1995) ("[A] refusal to follow regular screening procedures in a particular instance contravenes the statute . . . ."); Repp v. Anadarko Mun. Hosp., 43 F.3d 519, 522 (10th Cir. 1994) ("[A] hospital violates section 1395dd(a) when it does not follow its own standard procedures."); Gatewood, 933 F.2d at 1041 ("Thus, what constitutes an 'appropriate' screening is properly determined . . . by reference to a hospital's standard screening procedures. . . . [A]ny departure from standard screening procedures constitutes inappropriate screening in violation of the Emergency Act.").

On the record submitted here, there is a material issue of fact as to whether or not Day Kimball performed a screening examination that conformed to its own standard screening procedures.  Macamaux was transported to Day Kimball on a backboard, with a cervical collar, following an automobile accident, complaining of neck and back pain. Dr. Nelson, the physician who examined Macamaux, ordered x-rays for cervical spine trauma.  Day Kimball policy provides that when a patient is sent from the emergency department to the radiology department for diagnostic imaging of possible cervical spine trauma, the radiology department "must" take certain specific types of images, and that in one of these images the "C7–T1 junction MUST be clearly visualized."  Day Kimball Policy No. DI: Trauma Procedure (Pl. Ex. 10 at 13, 15) (emphasis omitted).  The policy further indicates that, if these tests are ordered when a radiologist is not on duty, as was the case here, the images will be brought to the Emergency Department for the physician to review, and the "physician will notify the technologist whether or not the patient needs any additional films."  Id. (Pl. Ex. 10 at 14).  It is uncontested that none of

the x-rays received and reviewed by Dr. Nelson permitted him to see and evaluate the C7 vertebrae or the C7-T1 junction. Indeed, Day Kimball's radiologist confirmed that the "C7 vertebral body is not well seen" and that "the C7 vertebral body is not included on the examination." Day Kimball Medical Records (Pl. Ex. 11) at 8-9. Thus, it is uncontested that, despite hospital policy that the "C7-T1 junction MUST be clearly visualized," Dr. Nelson discharged Macamaux without obtaining x-ray images that permitted him to see the C7 vertebra or the C7-T1 junction. One might argue that is not only sufficient to survive summary judgment, but to establish liability under EMTALA. See Gatewood, 933 F.2d at 1041 ("[A]ny departure from standard screening procedures constitutes inappropriate screening in violation of the Emergency Act.").

Day Kimball argues that the departure from policy in this case cannot support an EMTALA claim because the policy requiring an image showing the C7-T1 junction is addressed to the radiology department, not the emergency department. However, Day Kimball cites no authority that EMTALA liability may be founded only on a failure to follow policies directed specifically at the emergency department.[2] In an attempt to support such a limitation, Day Kimball asserts that the "obligations of EMTALA are imposed upon the Emergency Department of hospital," Reply at 3, but the text of the statute says otherwise. EMTALA expressly imposes a duty and a corresponding liability upon hospitals, not specifically upon emergency departments: "the hospital must provide an appropriate medical screening examination within the capability of the

---

[2] Such a rule would be absurd. Under that construction of the statute, a hospital would not be liable if it secretly directed its labs and radiology department not to follow their policies in the case of uninsured emergency patients, but instead to prepare fake reports or images so that emergency department doctors would discharge such patients under the impression that an adequate screening had been performed.

8

hospital's emergency department, including ancillary services routinely available to the emergency department . . . ." 42 U.S.C. § 1395dd(a).[3] Accordingly, a hospital may be liable regardless of whether the hospital's failure to provide an appropriate screening examination might be more specifically assigned to the emergency department itself or to an ancillary service working in conjunction with the emergency department, such as the radiology department.[4]

In any case, Day Kimball cites no evidence that discharging patients based on images that do not meet the terms of this diagnostic policy is within the standard screening practice of Day Kimball's emergency department. Day Kimball cites testimony that the policies are part of the "Diagnostic Services Manual" and that they provide instruction to "technologists [regarding the] procedure for doing trauma C spines." Slota Dep. (Reply Ex. 1) at 21, 26. This testimony does not rule out the possibility that the policy also reflects Day Kimball's expectations for its emergency department practice. Indeed, a finder of fact could reasonably infer that, if Day Kimball insists that an x-ray "MUST" show the C7-T1 junction, this is because the standard screening procedure for cervical spine trauma involves consideration of such an image.

Moreover, Dr. Nelson testified that an examination of cervical spine trauma is inadequate if the C7 vertebral body is not included, and that the appropriate measure to

---

[3] The case law consistently reflects the plain statutory language that Day Kimball ignores. See, e.g., Hardy, 164 F.3d at 792 ("EMTALA . . . imposes two primary obligations on . . . hospitals." (emphasis added)); Repp, 43 F.3d at 522 ("[A] hospital violates section 1395dd(a) when it does not follow its own standard procedures." (emphasis added)); Power, 42 F.3d at 856 ("The key requirement is that a hospital apply its standard of screening uniformly to all emergency room patients . . . ." (emphasis altered; quotation omitted)); Gatewood, 933 F.2d at 1039 (EMTALA "imposes on Medicare-provider hospitals a duty to afford medical screening . . . ." (emphasis added)).

[4] It bears noting that, under the circumstances of this case, it fell to the emergency department doctor to read the insufficient x-rays.

9

take in such a case is to order a "repeat film and do whatever's necessary." Nelson Dep. (Pl. Ex. 3) at 79-80. Plaintiff's expert similarly testified that, if "it is necessary to image the cervical spine at all, then it is necessary to image the entire cervical spine or else it is not a complete study." Johnson Dep. (Pl. Ex. 5) at 84. This testimony does not distinguish between the standard of care applicable in a malpractice claim and the standard screening practice at Day Kimball, which is relevant under EMTALA. Nonetheless, given such testimony and the written policy, a fact-finder could reasonably infer that Day Kimball's standard screening for cervical spine trauma includes obtaining and reviewing films that actually reveal the C7 vertebra prior to discharge.

The policy and medical testimony also prevents the court from deciding, as a matter of law, whether this is a case of misdiagnosis based upon an appropriate screening examination or a case of failure to provide an appropriate screening examination. See Def. Mem. at 25-26; Power, 42 F.3d at 859 ("[I]f [the standard tests] are performed and the doctor evaluating the results draws an incorrect conclusion, a violation of EMTALA may not be established, but medical negligence may be." (quotation omitted)). Day Kimball does not cite any evidence that conclusively explains why Dr. Nelson would order a second set of x-rays, after finding the first to be inadequate, and then discharge Macamaux after obtaining a second set of deficient x-rays. Given the diagnostic imaging policy and Dr. Nelson's own testimony, the finder of fact could reasonably conclude that Day Kimball provided Macamaux with a materially incomplete screening examination.

Finally, Day Kimball argues that it is entitled to summary judgment because Macamaux has failed to establish that it acted with an improper motive. Only the Sixth

Circuit has suggested that proof of motive is required for an EMTALA screening claim. See Cleland v. Bronson Health Care Group, Inc.,917 F.2d 266, 272 (6th Cir. 1990) ("'[A]ppropriate' must more correctly be interpreted to refer to the motives with which the hospital acts.").[5]  Every other circuit to consider the issue has held that the statute does not support this interpretation.  See Phillips v. Hillcrest Medical Center, 244 F.3d 790, 798 (10th Cir. 2001) ("EMTALA looks only at the participating hospital's actions, not motives."); Summers v. Baptist Medical Center Arkadelphia, 91 F.3d 1132, 1138 (8th Cir. 1996) (en banc) ("[T]he statute contains no such requirement . . . ."); Power, 42 F.3d at 857 (4th Cir.) ("We are persuaded that the D.C. Circuit's rejection of an improper motive requirement is indeed the correct approach."); Burditt v. U.S. Dep't of Health and Human Services, 934 F.2d 1362, 1373 (5th Cir. 1991) ("As written, EMTALA prevents patient dumping without [an improper motive] requirement.  We refuse to alter the statutory scheme." (citation omitted)); Gatewood, 933 F.2d at 1041 & n.3 (D.C. Cir.) ("We do not read subsection 1395dd(a) as referring in any way to the 'motives' with which an emergency room acts when it provides something less than its normal screening procedure.").  This latter group of decisions is persuasive.  The statutory language does not reflect any concern with motives.  See 42 U.S.C. § 1395dd(a).  Therefore, Macamaux is not required to show that Day Kimball acted with an improper motive in order to prevail on his EMTALA screening claim.

In sum, there is a material issue of fact as to whether Day Kimball provided a screening examination consistent with its own standard screening practice for cervical

---

[5] Day Kimball contends that Holcomb v. Monahan, 30 F.3d 116 (11th Cir. 1994), also supports an improper motive requirement. That decision does not mention, much less support, such a requirement.

11

spine trauma prior to discharging Macamaux. Therefore, Day Kimball's Motion for Summary Judgment is denied with respect to Count I.

### B.      Failure to Stabilize Pursuant to EMTALA (Count II)

In addition to requiring an appropriate medical screening, EMTALA requires stabilization of any known emergency medical conditions prior to discharge. Specifically, the statute provides:

> If any individual . . . comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either . . . such treatment as may be required to stabilize the medical condition, or [a transfer to another medical facility, under conditions further specified in subsection 1395dd(c)].

42 U.S.C. § 1395dd(b). In Count II, Macamaux alleges that Day Kimball violated this requirement by discharging him without stabilizing his condition or providing him with an appropriate transfer.

The statutory language indicates that EMTALA's stabilize or transfer requirement applies only where the hospital "determines" that the individual has an emergency medical condition. 42 U.S.C. § 1395dd(b). This language has been interpreted to require "actual knowledge," or diagnosis, of the emergency medical condition. See, e.g., Torretti v. Main Line Hospitals, Inc., 580 F.3d 168, 178 (3d Cir. 2009) (A claim for violation of subsection 1395(b) "requires that . . . the hospital actually knew of [plaintiff's emergency medical] condition . . . ."); Bryant v. Adventist Health System/West, 289 F.3d 1162, 1166 (9th Cir. 2002) ("[A] hospital has a duty to stabilize only those medical conditions that its staff detects."); Battle v. Mem. Hosp. at Gulfport, 228 F.3d 544, 558 (5th Cir. 2000) ("The duty to stabilize does not arise unless the hospital has actual

knowledge that the patient has an unstabilized medical emergency."); Summers, 91 F.3d at 1140 ("[U]nder the express wording of the statute, this portion of EMTALA applies only if the hospital determines that the individual has an emergency medical condition . . . ." (emphasis in original; quotation omitted)); Holcomb v. Monohan, 30 F.3d 116, 117 (11th Cir. 1994) ("To succeed on a section 1395dd(b) claim, a plaintiff must present evidence that . . . the hospital knew of the [emergency medical] condition . . . ."); Gatewood, 933 F.2d at 1041 ("Here, no such [emergency] condition was diagnosed, and the statute's stabilization and transfer requirements are therefore inapplicable.").

The statute defines an emergency medical condition as

> a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in--
>
> (i) placing the health of the individual . . . in serious jeopardy,
>
> (ii) serious impairment to bodily functions, or
>
> (iii) serious dysfunction of any bodily organ or part[.]

42 U.S.C. § 1395dd(e)(1)(A).

Macamaux admits that his emergency medical condition—a fractured C7 vertebra—was not diagnosed prior to his discharge. See Pl. L.R. 56(a)(2) St. at 8, ¶ 5 ("[T]he scans performs did not permit full visualization of Plaintiff's spine, specifically the C7 vertebral body could not be seen."). Macamaux admits that he was discharged "with a diagnosis of 'MVA, back strain,'" Pl. L.R. 56(a)(2) St. at 2, ¶ 20, and with "a diagnosis of contusions of the shoulder and scapular region," Pl. L.R. 56(a)(2) St. at 9, ¶ 13. Significantly, Macamaux also admits that, as a result of the inadequate scans, Day Kimball had not determined that he had a condition requiring stabilization. Pl. L.R.

56(a)(2) St. at 8, ¶ 9 ("Because the imaging did not present a complete picture of the Plaintiff's cervical spine, the scans did not show that Plaintiff had a fracture injury to his spine requiring stabilization, immediate care and treatment.").

Nonetheless, Macamaux argues that he may prevail on his stabilization claim because Day Kimball "was well aware of the potential severity of Plaintiff's injuries before his discharge." Opp. at 16 (emphasis added). In support of this assertion, Macamaux cites only the evidence that the diagnostic images obtained by Dr. Nelson did not rule out his emergency medical condition. This is not sufficient to create a material issue of fact on a claim under EMTALA's stabilization requirement. Evidence that Day Kimball had not adequately ruled out a C7 fracture does not support an inference that Day Kimball had actual knowledge that Macamaux had an emergency medical condition, as required by the statute.

Macamaux seeks to draw an analogy to the Fifth Circuit's decision in Battle, 228 F.3d 544. There, the court permitted plaintiff to proceed on an EMTALA stabilization claim although the record indicated that hospital had not correctly diagnosed the patient's underlying medical condition at the time of the discharge. However, in doing so, the Fifth Circuit relied on the fact that, prior to discharge, the doctor had diagnosed the patient as having another medical condition—seizure disorder—and on expert testimony that that condition was an emergency medical condition requiring stabilization. See Battle, 228 F.3d at 559. Here, there is no evidence that any medical professional at Day Kimball had diagnosed Macamaux as having any emergency medical condition prior to discharge. Macamaux's argument is essentially that Dr. Nelson had a reason to suspect an emergency medical condition and did not do enough

14

to investigate that suspicion.  This may be sufficient to establish an EMTALA screening claim or a claim for negligence, but it does not create a material issue of fact as to the actual knowledge requirement for an EMTALA stabilization claim.

Macamaux has failed to show that there is any issue of fact regarding an essential element of his EMTALA stabilization claim.  Therefore, Day Kimball is entitled to summary judgment on Count II.

### C. Lack of Informed Consent (Count IV)

In Count IV, Macamaux alleges that Day Kimball is liable for failing to obtain his informed consent "to the treatment and care Defendant Day Kimball proposed to administer and perform upon him . . . ."  Amended Complaint at 4, ¶ 2.  Macamaux does not indicate any procedure or affirmative form of treatment that Day Kimball performed without his informed consent.  Rather, it appears that the "treatment and care" at issue is the decision to discharge him without further treatment or testing.  See Opp. at 18 ("If Plaintiff had been informed of [the inadequate evaluation of his spine], he might have insisted on additional or different scans, or else sought treatment at another hospital.").

The Connecticut Supreme Court has explained that a medical malpractice claim based on lack of informed consent derives from the right against bodily intrusions that underlies the intentional torts of assault and battery:

> The informed consent doctrine derives from the principle that "[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent, commits an assault, for which he is liable in damages."

Sherwood v. Danbury Hosp., 278 Conn. 163, 180 (2006) (quoting Logan v. Greenwich

Hospital Ass'n, 191 Conn. 282, 288-89 (1983)).  A claim based on lack of informed consent is nonetheless analyzed as a claim for negligence, as it tests the doctor's performance of his "duty to exercise due care in informing a patient of medical risks." Sherwood, 278 Conn. at 180 (quotation omitted); see Logan, 191 Conn. at 299.

Under Connecticut law, "the doctrine of informed consent is a limited one."  Duffy v. Flagg, 279 Conn. 682, 693 (2006) (quotation omitted).  In 2001, the Connecticut Supreme Court observed that "[a]ll of the informed consent cases in Connecticut have involved the adequacy of information disclosed regarding the procedure and treatment to be performed." Alswanger v. Smego, 257 Conn. 58, 67 (2001) (collecting cases).  All of the cases cited by Macamaux involve claims based upon medical procedures actually performed upon a person.  See Duffy, 279 Conn. 682 (vaginal birth after cesarean section resulting in the need for emergency surgery); Sherwood, 278 Conn. 163 (blood transfusion resulting in HIV infection); Janusauskas v. Fichman, 264 Conn. 796 (2003) (radial keratotomy procedure resulting in loss of vision); Logan, 191 Conn. 282 (biopsy of the kidney resulting in punctured gallbladder).  Furthermore, in each case, the Connecticut Supreme Court has explained the relevant duty as a duty to provide information about the procedure to be performed upon the patient:

> [O]ur inquiry has been confined to whether the physician has disclosed:  "(1) the nature of the procedure, (2) the risks and hazards of the procedure, (3) the alternatives to the procedure, and (4) the anticipated benefits of the procedure."

Sherwood, 278 Conn. at 180 (quoting Logan, 191 Conn. at 292); accord Duffy, 279 Conn. at 692; Janusauskas, 264 Conn. at 810 n.12; Alswanger, 257 Conn. at 67-68.

Macamaux has cited no case in which any court has permitted a claim for lack of

16

informed consent based on a decision to discharge a patient without additional medical testing or medical care.  Such a claim is not supported by the underlying principles that a person has a right to decide what is done to his body and that a procedure performed without informed consent is an assault upon the person.  See Sherwood, 278 Conn. at 180.  Rather, such a claim would reflect an extension of the doctrine of informed consent beyond that underlying basis.

The Connecticut Superior Court has rejected this extension of informed consent. In Glover v. Griffin Health Services, the court held as follows:

> [P]laintiff's claims are based on allegations that the defendants failed to inform her of the limitations, results, findings, or significance of her CT scan, MRI, lumbar puncture and examinations, and that the defendants failed to inform her of additional tests or studies that were available. . . . Thus, the plaintiff's informed consent claims are devoid of any allegations of a failure to inform her of the risks or alternatives associated with a particular treatment or procedure that she received, and as such, fail to assert the requisite elements of this cause of action as set forth by Connecticut cases.

2006 WL 1828605, *4 (Conn. Super. June 21, 2006).  In a subsequent similar case, the Superior Court followed Glover where the plaintiffs' doctor failed to diagnose a serious condition revealed by a fetal ultrasound examination.  See Rich v. Foye, 51 Conn. Supp. 11, 34-35, 976 A.2d 819 (Conn. Super. 2007).  The Rich court similarly held that a claim for lack of informed consent could not be based on a failure to inform the patient properly of the results and the limits of the testing performed.  See id.

Further, in both cases, as in the present case, the doctor had misdiagnosed or failed to detect the problematic medical condition, and in both cases, the court held that such claims are more appropriately framed as claims for negligent misdiagnosis.  See

17

id.; Glover, 2006 WL 1828605, *4-*5 (citing Backlund v. University of Washington, 137 Wash. 2d 651, 661 n.2, 975 P.2d 950 (1999); Roukounakis v. Messer, 63 Mass. App. 482, 487, 826 N.E.2d 777 (2005)). Macamaux asserts such a claim in Count III of the Amended Complaint.

In sum, decisions of the Connecticut Supreme Court do not support a claim for lack of informed consent where a doctor fails to diagnose a condition, fails to inform the patient of the shortcomings of the diagnostic examination, and therefore, fails to treat the condition. Connecticut's lower courts have expressly rejected an extension of the doctrine of informed consent to such circumstances. Further, Connecticut law provides an opportunity for redress in such circumstances in the form of a claim for negligent misdiagnosis and treatment, a claim which is separately alleged here. Accordingly, the court holds that the doctrine of informed consent does not extend to the circumstances presented here. Day Kimball is entitled to summary judgment on Count IV.

**V.  CONCLUSION**

For the foregoing reasons, Day Kimball's Motion for Summary Judgment is **granted in part** and **denied in part**. It is granted with respect to Counts II and IV, and denied with respect to Count I.

**SO ORDERED.**

Dated at Bridgeport, Connecticut, this 16th day of September, 2011.

       /s/ Janet C. Hall_____
      Janet C. Hall
      United States District Judge